UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LITA MARIE BERTUZZI,

               Plaintiff,                       Case No. 5:15-cv-11623
                                                Judge Judith E. Levy
v.                                       Magistrate Judge Anthony P. Patti

COMMISSIONER OF
SOCIAL SECURITY,

               Defendant.
_____/

**RECOMMENDATION REGARDING PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT (DE 14) AND DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT (DE 17)**

**I.    RECOMMENDATION**: For the reasons that follow, it is

**RECOMMENDED** that the Court **GRANT** Plaintiff's motion for summary

judgment (DE 14), **DENY** Defendant's motion for summary judgment (DE 17),

and **REMAND** the matter to the Commissioner for further proceedings consistent

with this Report and Recommendation.

**II.    REPORT**

        Plaintiff, Lita Marie Bertuzzi, brings this action under 42 U.S.C. §§ 405(g),

1383(c)(3) for review of a final decision of the Commissioner of Social Security

("Commissioner") denying her application for disability insurance (DI) benefits.

This matter is before the United States Magistrate Judge for a Report and

Recommendation on Plaintiff's motion for summary judgment (DE 14), the Commissioner's cross motion for summary judgment (DE 17), the Plaintiff's reply (DE 18) and the administrative record (DE 7).

**A.    Background[1]**

Plaintiff filed her application for DI benefits on September 5, 2012, alleging that she has been disabled since July 1, 2012, at age 62.  (R. at 118-124; *see also* R. at 142-144, 145-147.)  Plaintiff alleges disability as a result of (1) chronic back pain, (2) bilateral hearing loss, (3) sciatica, (4) uncontrolled diabetes, (5) asthma, (6) gastroesophageal reflux disease (GERD), (7) tinnitus, (8) right knee arthritis, (9) fatigue, and (10) carpal tunnel.  (R. at 155-162.)  Plaintiff's application was denied on November 26, 2012 or December 6, 2012.  (R. at 53, 54-63; *see also* R. at 68-77.)

On December 26, 2012, Plaintiff sought a *de novo* hearing before an Administrative Law Judge ("ALJ").  (R. at 78-79.)  ALJ Timothy J. Christensen held a hearing on November 6, 2013, at which Plaintiff was represented by counsel (Bethany Versical), a hearing monitor was present (Deborah Doyle), and Vocational Expert (VE) Lawrence Zatkin testified.  (R. at 30-52.)  On December

---

[1] On June 15, 2012, prior to the application reviewed in this report and recommendation, Plaintiff was awarded monthly retirement benefits beginning July 2012.  (R. at 64-66.)

12, 2013, ALJ Christensen determined that Plaintiff was not disabled within the meaning of the Social Security Act.  (R. at 17-29.)

Plaintiff requested review of the hearing decision.  (R. at 14-16.)  On April 13, 2015, the Appeals Council denied Plaintiff's request for review.  (R. at 1-6.)  Thus, ALJ Revels's decision became the Commissioner's final decision.

Plaintiff then timely commenced the instant action on May 5, 2015.  (DE 1.)

### B.     Plaintiff's Medical History

Plaintiff alleges in her DI benefits application that she has been disabled since July 1, 2012.  (*See* R. at 118.)  Plaintiff's medical records span the period from September 27, 2006 through November 4, 2013.  (R. at 189-301 [Exhibits 1F-11F].)  Of particular import are those records post-dating Plaintiff's alleged July 1, 2012 date of onset.[2]

### 1.     From the alleged date of disability (July 1, 2012) through the single decision maker's (SDM's) decision

On July 11, 2012, Plaintiff was seen at the offices of Jeffery M. Bruner, D.O., P.C. & Angela M. Iocobelli, M.D. (Pediatric and Adult Allergy, Immunology & Bronchial Asthma).  (R. at 226-231, 233.)  Dr. Iocobelli referred Plaintiff for pulmonary function tests.  (R. at 238.)  A test dated July 23, 2012

---

[2] Plaintiff's surgical history appears to include myringotomy in both ears, both wrists, bilateral bunionectomy, cesarean section, hysterectomy, tonsillectomy and adenoidectomy.  (R. at 191, 249; *see also* R. at 276.)  However, the dates of these procedures are not apparent from the medical records.

3

indicated, *inter alia,* that Plaintiff had mild obstructive airways disease, which was partially reversible.  (R. at 235.)[3]  Dr. Iacobelli's August 15, 2012 notes reflect impressions of chronic cough, GERD, allergic rhinitis (both perennial and seasonal), environmental allergies, and history of type II diabetes and hypertension (R. at 232.)

Plaintiff underwent an audiology test on July 24, 2012, which revealed "[s]evere to profound sensorneural hearing loss[,]" and she was fitted with hearing aids that same month.  (R. at 191, 189.)  On August 17, 2012, she was seen by Muna A. Beeai, M.D. for a diabetes check and was diagnosed with diabetes mellitus, obesity, hearing loss and asthma, and abnormal hemoglobin results.  (R. at 194-199, 218-222.)  A September 4, 2012, bone mineral density test revealed what appeared to be degenerative changes in the lumbar spine.  (R. at 269-270.)

## 2.   From the SDM's decision (November 26, 2012) forward

On February 22, 2013, Plaintiff was seen again by Dr. Beeai, who diagnosed benign hypertension (HTN), diabetes mellitus, cough, hyperlipidemia and left hand pain, along with abnormal hemoglobin results.  (R. at 254-260, 261.)  On March

---

[3] Plaintiff underwent several other pulmonary function tests.  For example, Plaintiff's FEV1 (forced expiratory volume in 1 second) / predicted was:  68% with a lung age of 87 on July 11, 2012, although this test was marked "[p]oor session quality.  Interpret with care[,]" (R. at 241-242); 65% with a lung age of 90 on August 15, 2012 (R. at 240); and 78% with a lung age of 80 on September 19, 2012 (R. at 234.)  Also, a plethysmography report from July 23, 2012 indicates Plaintiff's FEV1 was 78% or 86%.  (R. at 236-237.)

4

21, 2013, Plaintiff saw physiatrist Michelle Bradley, D.O., who indicated that Plaintiff had carpal tunnel syndrome (CTS), mild on the left, as well as pain in her arm/leg. (R. at 245-247.) The following day, on March 22, 2013, Plaintiff was seen again by Dr. Beeai and diagnosed with benign hypertension (HTN), abdominal pain, diabetes mellitus and obesity. (R. at 248-253.)

Plaintiff saw hand surgeon Dr. Jeffrey M. Hall, M.D. on April 1, 2013, who noted improved left thumb flexor tendinitis and low-grade left medial epicondylitis. (R. at 265, 267-268.) It appears that Nancy Ajemian, M.D. or Dr. Beeai diagnosed Plaintiff with lumbago on the same date. (R. at 274, 284, 293.) Thereafter, Plaintiff underwent an initial evaluation at Complete Fitness Rehabilitation on June 25, 2013 and twice received recertification plans of care. (R. at 274-278, 284, 286-287, 293-295.) She was discharged on August 20, 2013, as "[s]killed services [were] no longer required." (R. at 298-299.)

Plaintiff was again seen by Dr. Beeai on August 23, 2013, at which time she diagnosed Plaintiff with benign hypertension (HTN), hyperlipidemia, allergic rhinitis, diabetes mellitus and pain of right thumb. (R. at 271-273.) Plaintiff again saw Dr. Hall on or about September 23, 2013, at which time he diagnosed stenosing tenosynovitis of the right thumb and left thumb flexor tendinitis and injected both thumb flexor tendon sheaths. (R. at 264, 266.) On November 4, 2013, Plaintiff was seen by audiologist Ginette Lezotte, who noted, among other

things, that she had been treating Plaintiff for 7 years, that she had hearing loss, and that her condition had worsened since it began. (R. at 301.)

### C.     Hearing Testimony (November 6, 2013)

#### 1.     Plaintiff's Testimony

Plaintiff testified at the November 6, 2013 hearing. According to Plaintiff, she last received a pay check in January 2013. (R. at 36.)[4] Although she still performs certain office functions, she no longer transcribes "because [she] can't hear[,]" and does not receive income from the business. (R. at 35-38.) She further explained that she has problems with her hands, including having had carpal tunnel syndrome and, in the last couple of years, tendonitis. (R. at 39.) Plaintiff suspects that she got tendonitis in her thumbs from keyboarding, guessing that "it's 50 years of using my hands typing and stuff has taken its toll." (R. at 40.)

Plaintiff also testified that she will sometimes respond when she doesn't hear someone fully, because she does not want to let people know she cannot hear. When she watches television, she uses closed captioning; otherwise, she "can't hear it." (R. at 42.) She periodically experiences ringing in the ears, which

---

[4] On September 5, 2012, Plaintiff completed an SSA work activity report regarding her self-employment (Expertise Medical Transcription) in medical transcription since June 11, 2012. (R. at 129-141.) An undated SSA work history report indicates that Plaintiff worked as a medical transcriptionist from November 1980 to September 2012. (R. at 148-154.)

requires her to stop what she is doing and reminds her she cannot hear.  (R. at 45-46.)  When she removes her hearing aids, she cannot hear at all.  (R. at 47.)

## 2.   Vocational Expert Testimony

VE Lawrence Zatkin also testified.  He classified Plaintiff's past work as a medical transcriptionist as sedentary, semi-skilled.  When asked to assume a hypothetical individual of the same age, education and work background as Plaintiff, but who is limited to light work, occasional postural activities, not working around hazards, no concentrated exposure to respiratory irritants, and only occasional communication issues due to poor hearing and speech recognition problems, the ALJ testified that "the occasional communication issues would be preclusive of past work."  (R. at 49.)

Nonetheless, the VE testified that certain clerical jobs where people input data, such as transcribing from written documents to typed documents, would be feasible; minimally, there are 5,000 such jobs in the southeast area or 10,000 statewide.  (R. at 50.)  However, the VE testified that such semi-skilled jobs would be precluded if such an individual were further limited to "only occasional use of the bilateral upper extremities for activities such as typing[,]" as a person must be able to frequently or often "use the upper extremities to input data[,]" on a repetitive basis.  (R. at 51.)

### D.     The Administrative Decision[5]

ALJ Christensen rendered his decision on November 6, 2013.  (R. at 17-29.)

At Step 1, he found that Plaintiff has not engaged in substantial gainful activity

since July 1, 2012, the alleged onset date.  (R. at 22.)

At Step 2, the ALJ found that Plaintiff has the following severe impairments:

hearing loss, stenosing tenosynovitis of the right thumb, and left thumb flexor

tendinitis.  (R. at 22.)

At Step 3, the ALJ found that Plaintiff does not have an impairment or

combination of impairments that meets or medically equals one of the listed

impairments.  (R. at 22-23.)

---

[5] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence.  *See* 20 C.F.R. §404.1520(a)(4); see also 20 C.F.R. § 416.920.  Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1.     Is the claimant engaged in substantial gainful activity?
2.     Does the claimant suffer from one or more severe impairments?
3.     Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?
4.     Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?
5.     Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. §404.1520(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

At Step 4, the ALJ found that Plaintiff has the RFC to perform light work (where she can lift and/or carry 20 pounds occasionally, and 10 pounds frequently, can sit up to six hours of an eight-hour workday, and can stand and/or walk up to six hours of an eight-hour workday) with certain postural limitations (can never climb ladders, ropes, and scaffolds, but can occasionally climb ramps and stairs; can occasionally balance, stoop, kneel, crouch, and crawl), environmental limitations (must avoid exposure hazards such as unprotected heights and dangerous moving machinery; must avoid concentrated exposure to respiratory irritants) and communicative limitations (limited to occasional communication due to poor hearing and speech recognition problems). (R. at 23-25.) Moreover, the ALJ found that Plaintiff is unable to perform any past relevant work. (R. at 25.)

At Step 5, having considered Plaintiff's age, education, work experience, and RFC, the ALJ found that Plaintiff has acquired work skills from past relevant work that are transferable to other occupations with jobs existing in significant numbers in the national economy. (R. at 25-26.)

### E.    Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision

if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. at 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. at 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In deciding whether substantial evidence supports the ALJ's decision, the court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

Although the substantial evidence standard is deferential, it is not trivial. The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that

10

would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'"  *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

### F.    Analysis

Plaintiff's motion for summary judgment presents two arguments:  (1) at Step 3, the ALJ did not obtain any expert opinion as to whether Plaintiff's medical impairments medically equaled Listing 2.10 and did not adequately explain his own findings as to whether Plaintiff met that Listing; and, (2) at Step 4, the ALJ did not determine the impact of Plaintiff's hand impairments, which the ALJ had found to be severe at Step 3.  (DE 14 at 10-15, 15-17; *see also* DE 18 at 4-5.)

The Commissioner contends that:  (1) substantial evidence supports the ALJ's Step 3 determination; (2) Plaintiff has not demonstrated that the ALJ omitted any significant limitations from the RFC finding; and, (3) reversal for payment of benefits is not appropriate.  (DE 17 at 3, 10-15, 15-17, 18-20.)

### 1.    The ALJ erred in his Step 3 analysis of hearing loss.

11

The ALJ properly considered whether Plaintiff's hearing loss *met the criteria* of Listing 2.10.  However, the ALJ did not properly consider whether Plaintiff's hearing loss *medically equaled* the criteria of Listing 2.10.

### a.   The ALJ properly considered whether Plaintiff's hearing loss *met the criteria* of Listing 2.10.

In order to meet Listing 2.10 ("Hearing loss not treated with cochlear implantation."), an individual must have either (A) "[a]n average air conduction hearing threshold of 90 decibels or greater in the better ear and an average bone conduction hearing threshold of 60 decibels or greater in the better ear . . .[,]" or (B) "[a] word recognition score of 40 percent or less in the better ear determined using a standardized list of phonetically balanced monosyllabic words . . . ."[6]

Within his Step 3 finding, the ALJ considered Listing 2.10 and noted that Plaintiff's hearing loss "does not meet or medically equal that Listing."  Citing treating audiologist Lezotte's July 24, 2012 report, the ALJ explained that Plaintiff's "[w]ord recognition in the better ear (right) is at 42% . . ., which is above the Listing Level limit of 40%."  (R. at 23, 191.)  In addition, at Step 4, the ALJ twice cited Lezotte's November 4, 2013 statement regarding hearing loss not treated with cochlear implants, which concluded that Plaintiff did not meet either of the conditions of Listing 2.10.  (*See* R. at 24, 301.)

---

[6] *See* https://www.ssa.gov/disability/professionals/bluebook/2.00-SpecialSensesandSpeech-Adult.htm#2_10

**b.    The ALJ did not properly consider whether Plaintiff's hearing loss *medically equaled* the criteria of Listing 2.10.**

**i.    Determining medical equivalence**

Seeming to agree that the ALJ analyzed whether Plaintiff's hearing loss *met* Listing 2.10's *criteria*, Plaintiff challenges the ALJ's analysis of whether Plaintiff's hearing loss *medically equaled* Listing 2.10's criteria.  (*See* DE 14 at 12.)  The regulations provide that "[i]f your impairment(s) does not meet the criteria of a listing, *it can medically equal the criteria of a listing*."  20 C.F.R. § 404.1525(c)(5) (emphasis added).  "Medical equivalence" can be found in three ways:

> (1)    the claimant has a listed impairment but does not exhibit the specified severity or findings, yet has "other findings" that are "at least of equal medical significance" to the criteria;
>
> (2)    the claimant has a non-listed impairment that is "at least of equal medical significance" to a listed impairment; or
>
> (3)    the claimant has a combination of impairments which do not individually meet a Listed Impairment, but are "at least of equal medical significance" to a listing when viewed in totality.

*Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 415 (6th Cir. 2011) (quoting 20 C.F.R. §§ 404.1526, 416.926).

Here, where the ALJ's Step 2 finding included hearing loss, and where the ALJ's Step 3 finding determined that Plaintiff's hearing loss did not meet Listing 2.10 ("Hearing loss not treated with cochlear implantation" ), medical equivalence

is evaluated under 20 C.F.R. §§ 404.1526(b)(1), 416.926(b)(1).  The SSA will find that an impairment "is medically equivalent to that listing if you have other findings related to your impairment that are at least of equal medical significance to the required criteria."  20 C.F.R. §§ 404.1526(b)(1)(ii), 416.926(b)(1)(ii).

### ii.    The ALJ *did not comply* with SSR 96-6p.

With regard to "Medical Equivalence to an Impairment in the Listing of Impairments[,]" the regulations provide, in part:

> The administrative law judge or Appeals Council is responsible for deciding the ultimate legal question whether a listing is met or equaled.  As trier of the facts, an administrative law judge or the Appeals Council is not bound by a finding by a State agency medical or psychological consultant or other program physician or psychologist as to whether an individual's impairment(s) is equivalent in severity to any impairment in the Listing of Impairments.  However, *longstanding policy requires that the judgment of a physician (or psychologist) designated by the Commissioner on the issue of equivalence* on the evidence before the administrative law judge or the Appeals Council *must* be received into the record as expert opinion evidence and given appropriate weight.

SSR 96-6P (S.S.A. July 2, 1996) (emphasis added); *see also Dorrough v. Comm'r of Soc. Sec.*, No. 11-12447, 2012 WL 4513621, at *2 (E.D. Mich. Oct. 2, 2012) ("It is imperative . . . that the ALJ properly construes the evidentiary record in making this determination, drawing the appropriate distinction between medical expert opinion and the views of non-physicians.") (Rosen, C.J.).

"The great weight of authority holds that a record lacking any medical advisor opinion on equivalency requires a remand."  *Covey v. Comm'r of Soc. Sec.*,

No. 12-10326, 2013 WL 462066, at *12 (E.D. Mich. Jan. 16, 2013), *report and recommendation of Hluchaniuk, M.J., accepted by Edmunds, J.*, No. 12-10326, 2013 WL 461535 (E.D. Mich. Feb. 7, 2013) (internal footnote omitted) (citing *Stratton v. Astrue*, 987 F.Supp.2d 135 (D.N.H. 2012)).  Plaintiff claims that the ALJ did not obtain such an opinion, noting that there was no consultative examination and that the November 26, 2012 / December 6, 2012 disability determination was rendered by a single decision maker (SDM) (Stephanie Warren).  (DE 14 at 14-15, R. at 53, 54-63.)

The Court should conclude that the ALJ did not comply with SSR 96-6p.  I note that the SDM considered Listing 2.10 and acknowledged in the credibility assessment that the "[a]udiogram supports some hearing loss . . . ."  (R. at 58.)  In addition, the SDM determined that Plaintiff's hearing was limited in both ears and that her speaking was limited (R. at 60.)  However, although Charles K. Lee, M.D.'s February 4, 2013 case analysis affirms the decision of the SDM, Dr. Lee affirmed the SDM's *RFC determination*.  (R. at 243-244.)  In other words, Dr. Lee did not opine on the issue of whether Plaintiff's hearing loss was *medically equivalent* to Listing 2.10.  This is so, even though Dr. Lee's case analysis acknowledged that Lezotte's July 24, 2012 pure tone testing (binaurally) revealed "severe to profound sensorneural hearing loss" and word recognition testing was "very poor" (8%) in the left ear and 42% in the right ear.  (R. at 191, 243.)  These

15

measures do not discuss whether Plaintiff has "*other findings* related to [her hearing loss] that are at least of equal medical significance to the required criteria [of Listing 2.10][,]" 20 C.F.R. §§ 404.1526(b)(1)(ii), 416.926(b)(1)(ii) (emphases added), such as air conduction, bone conduction or word recognition.

Also, the Commissioner's or the ALJ's personal observations are not an adequate substitute. The Commissioner argues that "hearing loss at higher frequencies is simply not equivalent to hearing loss at the frequencies contemplated by Listing 2.10(A)[,]" yet the Commissioner also acknowledges that "equaling the requirements of a Listing *necessitates medical judgment* showing that certain factors not contemplated by the specific criteria of a Listing are medically equivalent to meeting the criteria." (DE 17 at 12, 13 (emphasis added).) Likewise, while the ALJ's personal observations that "[Plaintiff] alleges that her hearing loss prevents her from working in her medical transcriptionist business, but I did not have a problem communicating with [her] at the hearing[,]" may have been sincere (R. at 24), this discounting of Plaintiff's credibility is not a substitute for medical judgment on medical equivalence.[7]

---

[7] Additionally, while not necessarily dispositive, the evidence on which the ALJ expressly relied to assess Plaintiff's hearing impairment did not come from an "acceptable medical source." Preliminarily, the ALJ's Step 2 finding that Plaintiff's severe impairments include "hearing loss," does not contain any express citations to the record. (R. at 22). Then, in both his Step 3 Listing 2.10 determination and his Step 4 RFC determination as to hearing, the ALJ relied upon the records of audiologist Lezotte. (R. at 23, 191; R. at 24, 191, 301.) Ultimately,

For these reasons, the Court should agree with Plaintiff that "the record . . .

lacks an opinion from a designated medical expert" as to whether her severe

hearing loss medically equals Listing 2.10.  (DE 18 at 5.)

> ### iii.   There is a plausible inference that Plaintiff's hearing loss medically equals Listing 2.10.

A remand is appropriate where a lay review of the record suggests it is

*plausible* that Plaintiff's impairments could medically equal a Listing.  *See Klink v.*

---

the ALJ assigned "some weight" to Lezotte's opinion(s) – presumably the
November 4, 2013 statement (R. at 301) - on the basis that it was "supported by the
audiology reports[,]" - presumably those dated September 27, 2006, October 26,
2009 and/or July 24, 2012 (R. at 191-193).  (R. at 24-25.)  In so doing, the ALJ
acknowledged that while Lezotte is not a source who can provide evidence *to
establish* an impairment (20 C.F.R. §§ 404.1513(a), 416.913(a)), she offered "an
opinion into the severity of the claimant's impairments and how they affect her
ability to function."  (R. at 24-25.)

In other words, an audiologist is an "other source" whose opinion can be
used "to show *the severity* of your impairment(s) and how it affects your ability to
work . . . ." 20 C.F.R. §§ 404.1513(d), 416.913(d) (emphasis added); *see also* SSR
06-03P (S.S.A. Aug. 9, 2006).  Thus, an audiologist may not "provide evidence *to
establish* an impairment." 20 C.F.R. §§ 404.1513(a), 416.913(a) (emphasis
added).   Here, the ALJ purportedly used Lezotte's opinions to assess *the severity*
of Plaintiff's hearing loss.

Lest there be doubt as to whether an "acceptable medical source" as defined
by this regulation is necessary to determine whether an individual's impairments
meets or medically equals a listing, I am persuaded by this Court's direction that
SSR 96-6p qualifies the ALJ's "discretion to decide equivalence . . . ." *Moran v.
Comm'r of Soc. Sec.*, 40 F. Supp. 3d 896, 922 (E.D. Mich. 2014) (Hood, J.,
accepting report and recommendation of Morris, M.J.).  In particular, I note the
explanation that, "[u]ltimately, the courts are concerned with preventing the ALJ
from making complex medical determinations; thus the cases simply ask whether
the record contains expert evidence and whether the ALJ adequately addresses this
evidence in her opinion." *Moran*, 40 F.Supp.3d at 924.

*Comm'r of Soc. Sec.*, No. 12-15172, 2014 WL 902707, at *10 (E.D. Mich. Mar. 7, 2014) (Tarnow, J., adopting report and recommendation of Michelson, M.J.) (remanding where a lay review of the record "suggests it is at least plausible that Plaintiff's impairments could medically equal . . ." a Listing); *see also McKeel v. Comm'r of Soc. Sec.*, No. 14-CV-12815, 2015 WL 3932546, at *10 (E.D. Mich. June 26, 2015) (Drain, J., accepting and adopting report and recommendation of Patti, M.J.) ("A review of the entire record indicates, in the opinion of this layperson, that it is plausible that Plaintiff's impairments could medically equal a Listing impairment.").

A lay review of the instant record suggests such plausibility as to Plaintiff's hearing loss.  For example, there are several pieces of record evidence which enlighten the Court regarding Plaintiff's severe hearing loss, such as audiologist Lezotte's September 27, 2006, October 26, 2009 and July 24, 2012 audiologic examinations and report.  (R. at 191-193, R. at 301.)[8]  In addition, Dr. Beeai's August 17, 2012 diagnoses included hearing loss.  (R. at 195.)  Also, Lezotte's November 4, 2013 treating audiologist statement opined that Plaintiff did not "have an average air conduction hearing threshold of 90 decibels or greater in the better ear and an average bone conduction hearing threshold of 60 decibels or

---

[8] The record also contains Grosse Pointe Audiology clinic notes spanning the period from January 2010 through August 14, 2012, many of which are initialed "GL."  (R. at 189-190.)

greater in the better ear[,]" (R. at 301), likely because the average air and bone conduction hearing at 500, 1000 and 2000 Hz did not meet the respective threshold. (*See* R. at 191-193, 20 C.F.R. § Pt. 404, Subpt. P, App. 1 ("To determine whether your hearing loss meets the air and bone conduction criteria in 2.10A, we will average your air and bone conduction hearing thresholds at 500, 1000, and 2000 Hertz (Hz).").) However, likely based on Lezotte's July 24, 2012 audiologic report testing Plaintiff's hearing level from 250-8000 dB (R. at 191), Lezotte's November 4, 2013 statement further noted that "[i]f you average all frequencies[,] it is [greater than] 90 dB[,]" (R. at 301). (DE 14 at 13.)

Stated otherwise, Plaintiff contends that Lezotte concluded that Plaintiff's hearing loss "was *equal* in severity to the severity described in the Listing[,]" and Plaintiff had "findings that nearly met *both* [2.10A and 2.10B]." (DE 14 at 14 (emphases in original).)[9] The Court should agree that, even if Plaintiff did not meet all of the criteria of Listing 2.10, "she offered evidence of 'other findings related to [her] impairment' which could be [']of equal medical significance to the required criteria.'"). *Andrews v. Comm'r of Soc. Sec.*, No. 12-13111, 2013 WL

---

[9] To be sure, "[i]t is insufficient that a claimant comes close to satisfying the requirements of a listed impairment." *Miller v. Comm'r of Soc. Sec.*, 848 F. Supp. 2d 694, 709 (E.D. Mich. 2011) (Friedman, J., accepting and adopting report and recommendation of Hluchaniuk, M.J.) (quoting *Elam ex rel. Golay v. Commissioner,* 348 F.3d 124, 125 (6th Cir. 2003)). *See also Dorton v. Heckler*, 789 F.2d 363, 367 (6th Cir. 1986) ("Admittedly Dorton's medical evidence *almost* establishes a disability under section 4.04(D) of Appendix 1.").

2200393, at *14 (E.D. Mich. May 20, 2013) (Cohn, J., adopting report and recommendation of Grand, M.J.) ((quoting 20 C.F.R. § 404.1526(b)(1)(i)).

### iv. The Court is not in a position to determine whether this error was harmless.

Even if an error occurred within the ALJ's Step 3 determination as to whether Plaintiff's hearing loss met or medically equaled Listing 2.10, the Court should consider whether it was accounted for by the ALJ's Step 4 determination that Plaintiff's RFC was "limited to occasional communication due to poor hearing and speech recognition problems." (R. at 23.) This is so, because an error early in the sequential process as to a particular impairment may be rendered harmless by the ALJ's treatment of that impairment in a later step of the process. *See Blackburn v. Astrue*, No. 1:09-CV-943, 2011 WL 2940399, at *4 (S.D. Ohio Mar. 2, 2011), *report and recommendation adopted sub nom. Blackburn v. Comm'r of Soc. Sec.*, No. 1:09CV943, 2011 WL 2940408 (S.D. Ohio July 19, 2011) ("Although an error at Step 2 will not always require reversal, such an error may require remand if the diagnosis and other evidence in the record support a finding of functional limitations that the ALJ failed to consider or include in a later step of the sequential analysis, when considering a claimant's RFC."), *Mortzfield v. Comm'r of Soc. Sec.*, No. 12-15270, 2014 WL 1304991, at *4 (E.D. Mich. Mar. 31, 2014) (Tarnow, J., adopting report and recommendation of Hluchaniuk, M.J.) (same); *see also Jones v. Comm'r of Soc. Sec.*, No. 4:14-CV-14417, 2016 WL

759439, at *1 (E.D. Mich. Feb. 26, 2016) (opinion and order of Patti, M.J.) (Step 2 error harmless based on Step 4 treatment).

Presently, the Court is unable to determine whether this error was harmless based upon the administrative record before it. To be sure, the ALJ's Step 4 RFC determination did include the limitation of "occasional communication due to poor hearing and speech recognition problems." (R. at 23.) This may have been based upon audiologist Lezotte's hearing tests (R. at 191-193), her treating audiologist statement (R. at 301), the SDM's determination that Plaintiff was bilaterally limited in hearing and limited in speaking (R. at 60), Dr. Lee's affirmance of that determination (R. at 243-244), or perhaps even Dr. Beeai's diagnosis of hearing loss (R. at 195). Even so, as noted above, these do not satisfy SSR 96-6p.

Instead, I am guided by a previous decision of this Court has to harmlessness where it found that an ALJ's failure to specifically evaluate Plaintiff's impairments under a particular listing constituted legal error:

> Even assuming that Andrews does not "meet" all of the criteria of Listing 1.04A*, she offered evidence of "other findings related to [her] impairment" which could be of equal medical significance to the required criteria." 20 C.F.R. § 404.1526(b)(1)(i)* . . . . Regardless of how the ALJ might ultimately decide Andrews' claims, at this juncture, the court cannot say that, if the ALJ had made the required findings at Step Three, she necessarily *would have* found that Andrews did not meet or medically equal the relevant Listing. And, if she does find that the evidence establishes medical equivalence, then Andrews would be presumptively entitled to benefits. . . . Because the court cannot say that the ALJ's error was harmless, remand is appropriate. . . .

21

*Andrews*, 2013 WL 2200393, at *14 (internal footnotes and citations omitted) (emphasis added).  Here, Plaintiff has offered evidence of other findings related to her hearing loss which could be of equal medical significance, such as the November 4, 2013 statement of treating audiologist Lezotte (R. at 301).  Thus, in the absence of a physician's judgment on the issue of equivalence, SSR 96-6p, remand is appropriate for the ALJ to consider, in accordance with SSR 96-6p, whether Plaintiff's hearing loss medically equals Listing 2.10.

> **2.    The ALJ's Step 4 RFC determination appropriately accounts for Plaintiff's Step 2 severe hand impairments (stenosing tenosynovitis of the right thumb and left thumb flexor tendinitis).**

Plaintiff's second statement of error alleges that the ALJ's Step 4 RFC determination does not contain an allowance for her severe hand impairments. (DE 14 at 16.)  By way of background, the ALJ determined at Step 2 that Plaintiff's severe impairments included stenosing tenosynovitis of the right thumb and left thumb flexor tendinitis.  (R. at 22.)  In other words, the ALJ concluded that these impairments "significantly limit[] [Plaintiff's] physical or mental ability to do basic work activities . . . ."  20 C.F.R. §§ 404.1520(c), 416.920(c).[10]

---

[10] Incidentally, at Step 3, the ALJ determined that these severe impairments did not meet or medically equal the severity of Listing 1.02 (Major Dysfunction of a Joint), as "there is no evidence of gross anatomical deformity in one major joint in each upper extremity."  (R. at 23.)

Nonetheless, "a finding of a severe impairment need not always result in limitations in an RFC." *Burns v. Astrue*, No. 2:11-CV-151-GZS, 2012 WL 313705, at *4 (D. Me. Jan. 30, 2012), *aff'd*, No. 2:11-CV-151-GZS, 2012 WL 567254 (D. Me. Feb. 21, 2012). Thus, it is important to consider the ALJ's Step 4 RFC determination as to Plaintiff's hand impairments:

> During an evaluation [on March 21, 2013] with Dr. Michael Bradley, DO, the claimant was diagnosed with left mild carpal tunnel syndrome (Ex. 5F/2 [R. at 246]). In April 2013, the claimant was diagnosed with left thumb flexor tendinitis, and low-grade left medial epicondylitis (Ex. 7F/5 [R. at 267]). Dr. Jeffrey Hall, M.D., noted that the claimant had no symptoms in regards to the carpal tunnel syndrome, and that her lateral epicondylitis was quite low-grade at that point in time. The claimant had minimal complaints of numbness and tingling in the [left] upper extremity. The claimant had received an injection with a corticosteroid in her flexor tendon sheath of her left thumb (Ex. 7F/4 [R. at 266]), and reported that she had significant improvement in that thumb.
>
> In September 2013, the claimant returned to Dr. Hall (Ex. 7F/2 [R. at 264]). She complained of *pain* in both of her thumbs, with the right thumb being worse than the left. She was diagnosed with stenosing tenosynovitis of the right thumb, and left thumb flexor tendinitis. The claimant received injections in both her thumb tendon sheaths.

(R. at 24 (emphasis added).) Thereafter, in concluding that Plaintiff's allegations were not fully credible, the ALJ specifically referenced Dr. Hall's notes and concluded that Plaintiff "gets an occasional injection, and has minimal complaints of numbness and tingling." (R. at 24.) Indeed, Dr. Hall's April 1, 2013 action plan opined that the EMG findings were postoperative changes and that Plaintiff had "essentially no symptoms in regards to carpal tunnel . . . [,]" Plaintiff's lateral

epicondylitis was "quite low-grade at this stage[,]" and "[n]o further injections [were] required for her thumb."  In addition, Dr. Hall recommended that Plaintiff "avoid any heavy lifting in the palm down direction[,]" and that Plaintiff return in one month, at which time, if she was still symptomatic, he would "proceed with a steroid injection for her elbow."  (R. at 267-268.)  Dr. Hall's September 23, 2013 recommendations were likewise conservative, including injections in both thumb flexor tendon sheaths and follow up in four weeks.  (R. at 264).

Plaintiff has the burden to successfully challenge the ALJ's Step 4 RFC determination.  *See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  Here, she has not done so.  Although Plaintiff argues that the ALJ should have included an RFC limitation which corresponded to his Step 2 severe hand impairment findings - presumably "only occasional use of the bilateral upper extremities for activities such as typing[,]" (R. at 51) - this section of Plaintiff's argument does not contain any citations to the medical records; it only cites certain pages of the ALJ's December 12, 2013 hearing decision – namely the Step 2 conclusion (R. at 22), the alleged absence of an allowance for her thumb or hand issues in the Step 4 RFC determination (R. at 23) and the Step 5 discussion's alleged "somewhat amorphous classification" of "data entry type jobs" (R. at 26) - and the portion of the VE's hearing testimony regarding the preclusive effect of the above-mentioned limitation (R. at 51.)  (*See* DE 14 at 15-17.)  Thus, as the

Commissioner correctly asserts, "Plaintiff has failed to demonstrate that her hand and thumb impairments caused significant functional limitations that the ALJ should have included in his RFC." (DE 17 at 16.)

Moreover, the absence of manipulative limitations and the imposition of exertional limitations are supported by the record. Specifically, the ALJ's RFC determination did not include any *manipulative limitations* (reaching, handling, fingering and feeling).[11] Still, it did include certain *exertional limitations* on lifting and/or carrying (20 pounds occasionally, and 10 pounds frequently), sitting (up to six hours of an eight-hour workday), and standing and/or walking (up to six hours of an eight-hour workday). (R. at 23.) These limitations are consistent with the SDM's observations on manipulative limitations and exertional limitations, whose opinion was affirmed by Dr. Lee. (R. at 59, 243-244; *see also* R. at 61-62.)[12] Thus, the Step 4 RFC determination's absence of manipulative limitations and presence of certain exertional limitations is supported by other evidence of record.

---

[11] *See Brooks v. Soc. Sec. Admin.*, 430 F. App'x 468, 471 (6th Cir. 2011), *Minor v. Comm'r of Soc. Sec.*, 513 F. App'x 417, 427 (6th Cir. 2013).) The SDM opined that Plaintiff did not have manipulative limitations, and Dr. Lee's case analysis affirmed the SDM's RFC finding. (R. at 59, 243-244.)

[12] Also, the Commissioner asserts that Dr. Hall's April 1, 2013 recommendation that Plaintiff "avoid any heavy lifting in the palm down direction[,]" is accommodated by the exertional limitation of light work. (DE 17 at 17, R. at 267-268.)

Finally, the ALJ's Step 4 RFC determination expressly noted that his consideration was based upon the requirements of 20 C.F.R. § 404.1529.  (R. at 23.)  In making a disability determination, the SSA considers all of the claimant's symptoms, "including pain, and the extent to which [the] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." 20 C.F.R. §§ 404.1529(a), 416.929(a).  Moreover, Subsection (c) of this regulation concerns "[e]valuating the intensity and persistence of your symptoms, such as pain, and determining the extent to which your symptoms limit your capacity for work[,]" and provides specific guidance on the consideration of "objective medical evidence" and "other evidence."  20 C.F.R. §§ 404.1529(c)(2),(3), 416.929(c)(2),(3).  Here, the ALJ's decision satisfied these criteria with respect to Plaintiff's severe hand impairments by acknowledging her testimony about pain in her hands, discussing the records of Dr. Bradley and Dr. Hall, and generally observing that Plaintiff "continues to help out in her transcription business, so despite her symptoms, she is able to continue to function in her business."  (R. at 24.)[13]

---

[13] Additionally, Plaintiff's undated work history report indicates that, in her job as a medical transcriptionist, she reached for 1.5 hours and wrote, typed or handled small objects for 6 hours each day; she also lifted and carried "boxes, papers, typewriters, as needed[,]" describing the heaviest weight lifted as 10 pounds and the weight frequently lifted as less than 10 pounds.  (R. at 149; *see also* R. at 158.)

In sum, as to her severe hand impairments, Plaintiff has failed to meet her burden of challenging the ALJ's Step 4 RFC determination, the ALJ's Step 4 RFC exertional limitations and absence of manipulative limitations is supported by substantial evidence, and the ALJ took 20 C.F.R. §§ 404.1529(a), 416.929(a) into consideration.  Therefore, the ALJ's Step 4 determination was not in error.[14]

### 3.   The Court need not consider Plaintiff's alternative request for relief.

Plaintiff alternatively asks the Court to find that Plaintiff's thumb impairments "so obviously demonstrate an inability to perform data entry work so as to justify a remand solely for the entry of an award."   (DE 14 at 17; *see also* DE 14 at 18.)  In response, the Commissioner argues that "reversal for payment of

---

[14] A portion of Plaintiff's second argument takes issue with the ALJ's Step 5 finding, such as labeling "data entry type jobs" as an "amorphous classification[,]" or considering it "unsupported by a true job title or so much as a single citation to a [DOT] occupational code," or calling it "poorly defined work."  (DE 14 at 16.) Relatedly, Plaintiff takes the position that "data entry type jobs" would "clearly require frequent, if not *constant*, use of the extremities."  (DE 14 at 17.)  However, while a challenge to the ALJ's Step 5 finding is an issue on which the Commissioner bears the burden of proof, *see Walters*, 127 F.3d at 529, Plaintiff here has not successfully challenged the ALJ's Step 4 RFC determination as to her severe hand impairments.  In other words, as the Commissioner states, the limitation of "occasional use of the bilateral upper extremity for activities such as typing . . ." is not supported by objective or testimonial record evidence and was "properly omitted from the ALJ's RFC."  (DE 17 at 17.)  *See Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 118-19 (6th Cir. 1994) ("the ALJ is not obliged to incorporate unsubstantiated complaints into his hypotheticals . . . .") (citation omitted).  Thus, the Court need not opine on Plaintiff's overstated assertion that "problems with both thumbs would undeniably have an impact upon [her] ability to do 'data entry type' work."  (DE 14 at 16.)

benefits is not appropriate."  (DE 17 at 18-20.)  If the Court agrees with my foregoing conclusion that the ALJ appropriately accounted for Plaintiff's severe hand impairments, then the Court need not weigh in on whether the ALJ's treatment of such impairments warrants "remand solely for the entry of an award." (DE 14 at 17.)  In any case, an immediate award of benefits is warranted "only if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits."  _White v. Comm'r of Soc. Sec._, 312 F. App'x 779, 790 (6th Cir. 2009) (internal citations omitted).  This is not such a case.

### G.    Conclusion

In sum, I conclude that further consideration is necessary.  According, it is **RECOMMENDED** that the Court **GRANT** Plaintiff's motion for summary judgment (DE 14), **DENY** Defendant's motion for summary judgment (DE 17), and **REMAND** the case pursuant to 42 U.S.C. § 405(g) to the Commissioner for further proceedings consistent with this Report and Recommendation.  Upon remand, with respect to the issue of whether Plaintiff's impairments medically equaled a Listing impairment, the ALJ should be directed to: obtain, receive and consider expert guidance; further develop the record, as necessary; and, perform a new Step 3 analysis and finding in light thereof.

### III.    PROCEDURE ON OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within 14 days of service, as provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72.1(d). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1981). Filing objections that raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1273 (6th Cir. 1987). Pursuant to Local Rule 72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," and "Objection No. 2," *etc.* Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," *etc.* If the Court determines that any objections are without merit, it may rule without awaiting the response.

29

Dated: June 24, 2016          s/Anthony P. Patti
                              Anthony P. Patti
                              UNITED STATES MAGISTRATE JUDGE


I hereby certify that a copy of the foregoing document was sent to parties of record on June 24, 2016, electronically and/or by U.S. Mail.

                              s/Michael Williams
                              Case Manager for the
                              Honorable Anthony P. Patti